May it please the court, my name is Bill Dossett and with me at council table is Ed Plummer. I represent ECM Inc., the plaintiff appellant in this case. Now we had a trial in this case ten years ago. At that trial, the jury was instructed that Placer Dome owed no duties to ECM under any contract or property law theory. This court held that was error. Placer Dome signed a joint venture agreement saying it was a tenant in common in the leasehold estate. And this court said for that reason, Placer Dome could owe duties to ECM under any clause in the lease that ran with the land. The court remanded for a trial on those property law issues. That trial never happened. So why are we back in front of you seven years later? Because it took a second remand from this court in December of 2001 to get the trial court to consider whether the particular closet issue here, section 19B, ran with the leasehold estate. Upon receiving that second remand, the trial court set the matter up for summary judgment again. And that was the very first time that the trial court considered the issue that's in front of you today. So what precisely did the district court get wrong in its analysis of this touch-and-concern requirement? The district court decided that when analyzing whether the covenant will run against the owner of the burdened estate, that the court should look only at the negative impacts of the covenant on the promisor in isolation. In the district court's written opinion, the court ignored all of the undisputed evidence about the purpose of the covenant to maintain and enhance title to the unpatented mining claims that were the subject of the lease. Does your argument hold force with regard to failing to disclose drill reports from parcels that were not included in the lease, but which were adjoining? That seems to me to be the weakest aspect of your argument. And, Your Honor, I believe that's a total straw man. We have never argued and do not argue that section 19B required disclosure of anything other than information regarding the leased property. But wasn't the most promising hole, whatever that drill hole was, in adjoining land as opposed to the land that was subject to the lease? And isn't it, knowing that there's this, and I'm not a gold miner, so you're going to have to bear with me, but isn't it the knowledge that that drill hole might contain commercially mineable amounts of gold that your client is complaining it needed to know about in the lease negotiations so that it would have a more complete understanding of what the real value of the lease was? No. And the question shows that Plasterdome's lawyers have been effective in really creating a straw man here, because absolutely not. From the very beginning, we are arguing that section 19B only required information about the leased claims, and that is limited to the property that is defined in the lease as making up the leasehold estate. That does not include the leasehold estate. I don't know, vein or pocket of gold that might, depending on which way it runs, run under a portion of your land too? Whether we would like to know or not, this clause did not require them to tell us anything about what they found at drill hole 91907. And all it required was that they disclose the information that they did, in fact, write in reports and was specifically regarding the leased claims. Now, what they have focused on is the idea that they were motivated to generate these reports about the leased claims. Let me be even more specific. Everybody agrees that the gas 2 discovery area is directly on the leased claims, and everybody agrees that this drill hole 91907, the hot hole, was outside the leased claims. Okay? So what they're saying is we were motivated to go and take a second look at the gas 2 discovery claims and generate reports and data about those claims by something we learned about adjacent property. That's the argument that they're making. And we are being very, very specific. But why is that an illogical argument? And, again, my ignorance of, you know, how gold veins run. You know, if it's right over there, you know, maybe it's under here in the corner of my land. If I just dig down deep enough and in the right place, maybe I'll be able to tap into it. Well, let's break it down. First, they don't have to disclose the motivation, just what they've done on our claims. If it is true that knowing something about our claims, if knowing something about gas 2 leads us to the conclusion that there may be a continuation of this geological feature on adjoining property, if that is true, it is solely a result of the geology of the land and the fact that we humans have put lines across it that are property lines. That fact relates solely to the land. It's not something personal between us and PDUS or anyone else. It's a characteristic of geology that that, in fact, happens. But the obligation is a personal obligation to disclose information, is it not? And why isn't that more like a contract obligation as opposed to a covenant that runs with the land? Well, the question, it is like a contract obligation. That's what a covenant is. The question about what makes a running covenant unique is whether or not the type of promise that is made is one that is inherently tied up with ownership of land and the type of promise that one can make because one owns land. And in this situation, that is definitely true. The purpose of this covenant is undisputed. And we've listed a number of different purposes of this covenant, but the one that everybody agrees on is this, that under this lease, the tenant has the obligation to perform what they call the assessment work. They've got to go onto the property. Excuse me. Excuse me. The tenant had the obligation to go onto the property and do this assessment work. The assessment work required them to do either exploration or mining and to file the affidavits and reports necessary to maintain title to the claims. Now, Section 19B required the lessee to disclose to the lessor the reports and data regarding the mining claims, specifically the information about mineral occurrence, which is the geology of those claims, and the economics or feasibility of mining those claims, what is on the land, and whether you can take it out of the land. Excuse me, Your Honor. Now, these were precisely the types of information that would be needed to patent the claims if a discovery was made. And these were precisely the types of information that the lessor would need to file the annual assessment affidavits if the lessee failed to do that. And these were precisely the types of information that the lessee would need to value his reversionary interest in the property. So what we have to do is look at the connection between those purposes and the estates and land, because that's the one thing that's clear in all of the cases cited, particularly that Flying Diamond case, which is relied on by both parties and the district court, is that the focus has to be on the overall purpose of the covenant and the connection between the estates and land. But Flying Diamond is a little different factually. I mean, that really does have to do with disturbing the surface of the property, which is also being the surface, as I understand it, was being used by the sheep company for running livestock. And the mineral holder underneath wanted at the same time to, what, drill for oil, I guess, which is obviously going to have a direct impact on the ability to use the surface for running sheep. So I can see in that case a more direct correlation between the covenant and the actual use of the land. Here it seems to me that the covenant is really oriented more towards helping both parties understand whether or not this land is of greater value, both for purposes of determining, you know, what it's worth for leasing but also whether it's economically feasible to mine it. The Flying Diamond case focuses on the question of whether the royalty payment runs. And, I mean, a critical point there is that if you take the royalty payment in isolation, it's just a promise to pay money. So if you look at it just alone, it cannot run with a burdened estate. Well, except that the petroleum-producing operations would, in fact, have a direct impact on the ability to use the surface for sheep. And to the extent that there should be some adjustment in the royalty or in the compensation, I guess, to the sheep company, I can see a more direct correlation. The question in that case was whether the benefit ran to the subsequent surface owner. So the key thing about what the Court did there is the reasoning of the Court. What the Court said is we're going to look to this overall purpose. And specifically what they said is the purpose of this royalty agreement that the surface owner and the mineral estate owner reached was to give the surface owner an incentive to let the mineral owner come onto the land and do this work. And the key point that the Court focused on is they could have done that using their already existing interest in land because there are implied easements that would let the mineral owner come onto the surface for that purpose. So the Court said we're going to find the purpose of this very specifically to be avoiding disputes. They created this additional incentive to give the surface owner a stake in the mining operation to incentivize him to allow these access rights. So what they did is they focused specifically on the benefit to the burdened estate to find that this benefit ran. And that's exactly the opposite of what Judge Reed did in this case. What Plasterdome is asking you to do is to not look at this overall purpose. They want you to just focus on the purpose of the effects on the burdened estate. Instead, what you must do is look at the overall purpose of this covenant. And as I began to say a few minutes ago, this overall purpose relates directly to ownership of the property and title to the property. The key point is under this lease, the tenant had the obligation to do this assessment work. And we all agree if that wasn't done, they could lose both the lessee and the lessor would lose title to their estates because the U.S. government could say you no longer have these mining claims at all. If the lessee tried in good faith to do it but did not accomplish the assessment work, there would be no damages under the terms of this lease for the lessee. So is the land itself owned by BLM? The land is owned by the United States government, managed by the Bureau of Land Management, and only after the claims are patented are the rights of the patent owners good against the U.S. government. And that's why this information is so critical, because the information that was required to be disclosed by this lease covenant  It's the geology and it's the economics, the feasibility of taking the minerals out of the land. And if you look at this lease, within the overall purpose of this clause in this specific lease, it is directly tied to their positions as the owner of a leasehold estate, the present owner, and their owner of a reversionary interest. Pardon me, counsel. Under Section 13 of the lease, the lessee was required to do certain work and make certain reports to the BLM to maintain the title, right? Yes. But none of those reports necessarily had to do with mineral occurrence or the economics of mine operation, did they? They did. Well, then if that's so, why isn't that information sufficient for you? And then you don't need Section 19. Well, the way this works is that the only things that you can do on these claims to begin with, I mean, that you don't have unlimited rights as an owner of an unpatented mining claim to go on the property and do whatever you want to. You've got to search for minerals and, if possible, extract minerals. And what you're doing in those affidavits is telling the BLM. And the public. Yes, that you are, in fact, doing that and exercising sufficient diligence to do that. It's true that when you file the affidavit, you don't put in every single report that you generated. But if the tenant failed to do this and the landlord needed to step in, the landlord would need all of those reports in order to put together the affidavit saying, yes, we spent this much money and we acted diligently to pursue these claims. But those two Section 13 deals with a different kind of report than Section 19. All right. I know. I don't agree with that. The types of reports that are that are at issue here, and there's many, many of them that are in the record are standard geologic reports that are generated by people that do this type of exploration work. And they are. Is there any claim that they didn't fulfill Section 13 requirements? No. That is not the claim. Then why didn't you find out everything you needed to know from the public record? Because, again, they don't have to file every single one of the reports. So the two reports aren't the same. There are different reports under 19 than there are under 13. Isn't that right? Yes. The affidavit that is filed is different. I'm sorry. I didn't understand your question, Your Honor. The affidavit is different, has less information than that would be in the reports. But you need the reports to do the affidavit. At this point, I'll reserve the rest of my time. Very well. If you may, please, the Court, Counsel. Let me pick up where Counsel Faresian left off. Are you Mr. Patula? I am. Thank you. All right. There are two kinds of reports going on here, and they do differ in a way that's significant to this case, I think. The way ECM construes and must construe Section 19B of this 1987 lease in order to have any claim against PDUS is that 19B must obligate the lessee to disclose any data or reports regarding the lease claims, regardless of the source of the data, regardless of the source of the report or the analysis. In reality, the real key word here is interpretive reports. That's what are really at issue. If you look at the record below, there are two kinds of evidence that ECM is still claiming is not disclosed to it by Placidome and should have been. One are the kinds of reports and data that Royal Gold generated solely from the gas claims, the only place where Royal Gold operated. Those reports cannot support a cause of action for ECM because ECM has admitted that it received all of those reports and all of that data. In other words, ECM knew everything it was supposed to know about data and reports solely based on data from the gas claims. What is really at issue in this case is the hot hole and what it meant. The mineralized trend documents are the ones that are at issue. That is a mineralized trend of several miles, which was hypothesized by PDUS and Cortez geologists by looking at the data from the gas claims, but indeed far more materially and, importantly, data from outside the gas claims, particularly DH-91907, the drill results that Goldfields had shared with PDUS during their negotiations. So what we have here is indeed two very different kinds of reports. This case has always been about the disclosure of the second kind of report. When it was a RICO case 13 years ago, it was about that kind of disclosure. When it went to trial 10 years ago to a jury for two months on intentional fraud claims, it was about that kind of disclosure. And in between, we litigated innumerable theories about that kind of disclosure under the law of fiduciaries. Is it your point? Is it your position that all the reports regarding the leased property were already given to ECM? All of the reports which are based on data taken solely from the gas claims, either ECM already had because it had the data from Royal, or the reports that they prepared or that PDUS prepared were in substance identical and not materially different from what Royal had analyzed. You heard counsel saying that all they wanted was the reports and the data regarding the leased property. Is it your position the record shows that they got that? Well, they got that except there's a word game going on here because it has to do with the word regarding. And the word game is the key, I think. What you'll see, if you look carefully at the briefs and at the record, what they are saying is that we were supposed to have redacted a discussion of the mineralized trend that ran across the gas claims to only talk about the mineralized trend as if it went over the gas claims. But as a matter of common sense, you can't do that. And the point is simply this. You wouldn't be talking about a mineralized trend across the gas claims if there weren't a mineralized trend in the entire area. That's what the evidence shows. In other words, the mineralized trend is a function of DH-91907, the hot hole. It's a function of the Goldfields drill results further to the south from 91907 and the gas claims drill results. It's only by putting all of that together that you now have a trend. So what ECM's, pardon me, Your Honor. I think what counsel is saying is if you told them there was a mineralized trend on the gas claim, you didn't have to tell them where it went or where it ended up or where it was more valuable in one place or the other. But that trend is data which would be a burden upon your leasehold ownership, because by giving up that information, it's likely that on a renegotiation or a termination, ECM would not give up as much as they did give up. Well, first of all, if that were the purpose, we're talking about a purpose in negotiating a new estate or a new deal, which by definition can't be a covenant that runs with the existing estates, number one. But number two, no, that's the termination. No, in fact. It would give up. Excuse me? At termination, there has to be a compensation at termination, wasn't there? No, there's no compensation. The purpose to which ECM seeks to put this lease is the same purpose to which it's always been arguing in this litigation, which is that it would have used the information to its advantage in creating a new lease with PDUS. Royal Gold was already functionally they hadn't functioned at all for over a year on the land. But I want to get back to this trend, because it's really important that this be understood. The only way to present information about the trend on the gas claims is to acknowledge that there is a trend. At the time, the record is undisputed that there was no discovery. The gas two drill results were mixed. They did not show a trend. They did not show a mineable ore body. They did not amount to a discovery. That is undisputed on the record. It's only because of DH 91907 and other drill results between the Cortez Placer Dome property to the north and the gas claims, it's only because of that additional data from outside the gas claims that you can hypothesize a mineralized trend. So if the reports that they say they're entitled to had been given to them, it would necessarily have to disclose, maybe not the specific data, but would have to disclose the existence of very, very powerful data. Even if you didn't give them the assay numbers, it would have to tell them as geologists that there was a powerful set of data outside the gas claims that we had discovered. Let me make sure I understand what you're saying. We've got the lease claim that ECM controlled. Right. We have the drill hole 91907 outside of it, and then we have another area which is outside to the south. Actually, it's between. We have Cortez Land up here where 91907 is drilled. Then there's some drilling by Goldfields, the third company. Okay. And then there's the gas claims to the south. All right. And we know that the drill hole looks pretty good. We know, I take it, that the second area that's outside looks pretty good, and there's some sort of proprietary scientific theory that somebody has applied to suggest that we might have, I'll call it a vein, I don't know if that's the right term, but a geological trend that may run all the way across, including underneath ECMs. Right. And if you look at just the gas data, the gas claims data that they had a right to and that they did have, they testified that it's only one chance in five, based on that data alone, that there would be a mineable ore body discovered on the gas claims. Now, they also testified, interestingly enough, at trial, that even if you had the other data from the properties to the north, including ours, it's still only one in five. But they also said, we would like to have known that, because it would have put us in a better position to bargain with you over royalties. Because it's looking a lot better than if we're just looking at the results of gas tubes. Exactly. But only because DH-91907 is truly a hot hole. It was the all-American hole of 1991. I mean, if you can imagine. It was all pro in every respect. It was a tremendously remarkable hole. It was just one hole, but it changed the entire dynamic in the Valley. And, of course, it resulted in tremendous royalties. Then there's something I don't understand. If counsel says that they don't feel they were entitled to the hot hole or gold fields data, but they did want to know what was on their piece of property, are you telling me that you told them what was on their piece of property? We told them. They had all the data. We weren't the operator on the ground at the time. Royal Gold was the one providing the information, and they've acknowledged that they have all the data from Royal Gold. What we didn't tell them is what we could infer about their property, but only because of what we learned from outside the property. I think that's probably the easiest way to put it. And that's one of the reasons why the district court recognized that the scope of the obligation that ECM had to argue here for under 19b was not bounded by the gas claims. It wasn't bounded by the leased property. As a matter of fact, it wasn't even bounded by property at all. Let me give you an example. It really depended upon what you knew, not what you owned. For example, if Plasterdome was conducting exploration in some other part of the world and had learned proprietary information about certain geologic formations, which happens frequently with a company that does exactly this all over the world, if the geologic formations that it had learned about were similar to the geologic formations that they had found on the gas, that Royal had found on the gas claims, now PDUS would have an obligation to tell ECM this data, this information, excuse me, this report, this inference about the gas claims, even though it's based on some theory that isn't even connected to land. That's why the obligation by its nature must be what we call personal, or actually put better here, collateral to ownership, is the phrase that's been used. It is noteworthy, I submit, Your Honors, that since Spencer's case was decided in 1536 and the doctrine of running covenants first established, we have not found, neither side has found, a single case where a duty to disclose information about land has run with the land. Now, you would think somewhere in 600 years and the last 13 years of litigation where we've looked at, I can't say we've looked at every case in the last 600 years, but I'll bet we come very close to it. But your position is that it's not a matter of revealing information about the leased property. You'd given them that through Royal Gold. And the only thing that you didn't give them was the inference that you drew based on out-of-property prospecting. But I want this clear. We did not give them the inferences we drew about the gas claims based on data from outside. I agree. And that's what we believe. If that was our obligation, that's an obligation that could not run with the land or touch and concern the land. I think it's important. It can't touch and concern this land. Just as this Court held by analogy, and the district court recognized this, this Court in 2001 held that the area of influence covenant in the same lease did not run with the land. And the reason it did not is because it necessarily extended and had a scope of obligation beyond the boundaries of the leased property. So by analogy, again, here, the obligation to make or reveal inferences based upon data from outside the property would define that scope. Again, it's not what you own that controls your obligation to disclose. It's what you know. I think it's also important. What you know from elsewhere. What you know from anywhere, I think, is the way to put it. The point is it's not bounded to the land. I think it might be important to look, if we can, quickly at some of the cases that have been already discussed and point out two important facets. We're talking about Nevada real property law. There hasn't been much on this subject for 40 years. But what is there pretty clearly requires this. Before a burden is going to be enforced against the successor of an original covenantor, that burden is going to have to be shown to touch and concern the land. Not merely the benefit to the dominant estate. And the Reno v. Matley case by the Nevada Supreme Court makes pretty clear that a burden does not run as easily as a benefit. And, in fact, the Court says and points out that the reason the burden runs much more difficultly or it's harder to run the burden on the burden side is because it goes to the public policy regarding the alienability and restraints on alienation of property. Obviously, the successor being able to claim the benefit does not restrain the alienation of the estate, the dominant estate. But burdening the Servian estate does. And the Supreme Court of Nevada recognized that in no uncertain terms. But you don't dispute the fact that it burdens your leasehold to have to make revelations which lower the value of your leasehold. No. As a matter of fact, it does not burden the ownership interest. And that's why it's collateral. It burdens your ownership interest because you own the lease. Excuse me? I'm sorry. It burdens your ownership interest because your ownership interest is out of a lessee. Yes. But it does not burden the ownership interest. It doesn't burden the fee interest. No. It doesn't burden the lessee's interest either as to the ownership interest itself. It's a personal. All obligations are a burden. I mean, in that sense, all obligations are a burden. The question is whether the burden actually touches and concerns the land, which requires under Nevada law that it be integral to the property ownership interest itself, that it actually affect the legal interest. As a matter of fact, in the, if I could, Your Honor, in the Flying Diamond case, there's a very important case that I think was not emphasized sufficiently in the briefs as I was preparing for this argument today, and I do want to emphasize it. The district court recognized that this particular covenant had no physical connection. It didn't require anybody to go and do anything on the land. That's very important in a burden case. So one of the analogies you might do is look at other covenants that don't require physical acts. Like, for example, how about the payment of money that doesn't require a physical act on the property or doesn't physically connect with the property? In footnote 10 of the Flying Diamond case that we've referred to, there's a case which emphasizes this very point. It says, jump ahead here and find it in a minute, the promise to pay money is necessarily dependent on the purpose of the payment and thus should not stand alone. Accordingly, most courts have considered promises to pay money in the context of benefit to the covenantor. However, where the issue is burden, we have seven cases cited in the footnote. However, a covenant to pay often does not run with the land, even though it arises out of a covenant that does. And they cite one case from New York, Nassau County v. Kensington, where the promise to pay assessments in development was held not to touch in concern the land because the covenant itself did not specify the purpose of the payments, the covenant itself. This covenant specifies no purpose. Let's look, if I may, at the three things that I think this covenant is missing. If there's any hope, as I said, for 600 years there's no case anyone has found where a duty to disclose information has been held to run with the estate. But let's look at what might at least arguably be a covenant, if you look at the case law. First of all, if there's a requirement that you have to go on the land and generate the information from the land, in other words, if the covenant required the lessee to go on the land and generate data or information. Secondly, that it required the lessee to reveal and disclose that data to the lessor, and not interpretation of the data, because as soon as you interject interpretation, you're interjecting the personal characteristics or traits of your covenantor, and that will destroy any chance that the obligation will be a covenant running with the land. It becomes a personal covenant or a covenant collateral to ownership. And the third thing that would be required, because this is not a covenant that has sufficient physical contact, the purpose would have to be specified in the covenant itself, and that purpose would have to be one which in some way altered or impacted the ownership interests of the servient estate. Those would be at a minimum the requirements to even have an argument that a duty to disclose information about land was a covenant that ran with the land. This covenant meets not one of those elements. First of all, as the district court pointed out, there is no requirement to go on the land and do anything. There's no requirement. How can you find out mineral occurrence or the economic operation of mining without going on the land? Well, of course you have to, but the question is does this covenant require it, not some other covenant or some other part of the lease. This covenant doesn't require it, and that's all we're talking about is paragraph 19B. This is a very important real property concept. It's almost like you have to take 19B and sever it off here and look at it and say it's a part of the property. It's a part of the real property. You have to do that with each covenant before you can determine whether the covenant runs with the lease or runs with the land. The 19B does not require anyone to do anything on this land. Secondly, it doesn't require the disclosure, according to ECM, of merely data taken from the land, because if that were the case, we wouldn't be here today. They're claiming that anything regarding the land includes interpretation of the data, and that interjects the personal characteristics of the interpreter, of the covenantor, of the obligor, more accurately. And thirdly, this particular covenant specifies no purpose, let alone a purpose that's I think it's important to recognize as well in the Flying Diamond case one other quote. The covenant in question to run with the land, quote, this is at the ‑‑ I'm sorry, I don't have the page site, but we'll get it later. It's in the body of the opinion. I think it's at page 724. The effect of the covenant on the legal rights which otherwise would flow from ownership of land and which are connected with the land, the problem then is, or the question then is, and here's the quote, does the covenant in its purpose and effect substantially alter those rights? Does the obligation to disclose information actually affect and alter substantially the rights in ownership of the estate? Not just what duties you ‑‑ if the duty you have is a burden, you've promised to do something, it's presumptively, especially in this context of a burden we're talking about rather than a benefit, it is presumptively a personal obligation that is enforceable by contract and by privity of contract through an assignment of the lease with an assumption by the successive trust grantee, which is the way it is typically done in the mining industry, by the way, as the record shows. But in this situation, to run the covenant with the land, you would have to alter the rights of ownership in the servient estate merely by the existence of the covenant as written, not the way it might be used indirectly, which, of course, brings me to the other point, and I believe I've run out of time. Okay. Thank you. Thank you very much. Roboto. Counsel, what information about the leased property did you not get? About the leased property, not about the hot hole, not about Goldfields, but about the leased property. Let me be absolutely clear, and I think this document, which is the first exhibit to the blue brief, will help. This area here that I'm pointing to is the gas two discovery area. There were 28 holes drilled there by Royal. The raw data regarding those holes was disclosed earlier. We didn't get that from Placer. We got that from Royal. Now, there's a whole series of very specific reports and data generated by Placer geologists regarding specifically that gas two discovery area, and if you turn, I'll give you the site. It's to our initial excerpts of record section. It's page 87, page 90, page 96. You'll get examples of those. They follow that. For example, one of them was a preliminary block model or reserve study done specifically just on this area on the claims, not on a trend. Another was a pit optimization model to find out whether it was economic to take the ore out of this specific area on the claims. None of that was provided to ECM. The idea that that information is somehow about other information or other property is simply wrong. That information is absolutely and specifically about the ECM claims. What he's really focusing on is a materiality argument here, somehow that, well, you didn't really need this. It wouldn't have told you anything new because you already had the raw data. The district court, who had tried this case 10 years ago and knew all about all these reports, did not rule on the basis that this information that we required to be disclosed was not material, and that's not an issue that's before you today. If there's any materiality question at all, well, first of all, this is a contract. If they owe this duty, it's enforced as a contract. They are liable for breach of that contract, and it's not a materiality question at all. This is not a tort claim. I thought we resolved all of the contract theories and that the only issue remaining in the case was whether this was a covenant that ran with the land. Right. Now you're talking contract theory. If this covenant runs, if this court holds that covenant runs, then the law that governs whether or not there's a breach and whether there's damages for that breach is just the law of contract. And whether or not this is a material breach or not. What is the difference between the reports you got from Royal Gold on the 28 holes that you indicated and the reports by Placer Dome on page 8790, 96th of your record? What difference is there between the two? Substantial difference. One of them is just raw data showing the occurrence of data on the levels of mineralization occurring at different levels down the dirt. Another is a very detailed report saying, here is a block model showing exactly how these 28 drill holes can be extrapolated to model the actual ore body that exists in the ground on the ECM place. In your position, that goes to the economic ability to mine the place. It goes to both the specific geology and the economics. This is an example of something that is typically created and directly covered by this lease. You're out of time. Thank you very much. The case just argued is submitted, and we'll do our best to get you an answer. That concludes our calendar for this morning, and we will be adjourned until 9 a.m. tomorrow morning. All rise. Thank you. My voice is still there. We can do that again.
judges: Tallman, Bybee, Bea